```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF NEW JERSEY

NINA AGDAL,                         .
                                    .
        Plaintiff,                  .
                                    .  Case No. 23-cv-16873
vs.                                 .
                                    .  Newark, New Jersey
DILLON DANIS,                       .  July 11, 2024
                                    .
        Defendant.                  .
                                    .


                    TRANSCRIPT OF HEARING
         BEFORE THE HONORABLE MICHAEL A. HAMMER
             UNITED STATES MAGISTRATE JUDGE


APPEARANCES (the parties appeared in person):

 For the Plaintiff:      JOSEPH BRUCE SHUMOFSKY, ESQ.
                         Sills Cummis & Gross P.C.
                         One Riverfront Plaza
                         Newark, NJ 07102
                         (973) 643-5382
                         jshumofsky@sillscummis.com

                         JASON L. MAYS, ESQ.
                         MNR Law Firm
                         One Biscayne Tower
                         2 South Biscayne Blvd, Suite 2530
                         Miami, Florida 3313-1000
                         (305) 434-4941
                         jmays@mnrlawfirm.com




Audio Operator:

Transcription Service:   KING TRANSCRIPTION SERVICES, LLC
                         3 South Corporate Drive, Suite 203
                         Riverdale, NJ  07457
                         (973) 237-6080


Proceedings recorded by electronic sound recording (not all
parties were discernible on the record); transcript produced
by transcription service.
```

```
 1  (APPEARANCES continued)

 2  For the Defendant:      MARK A. BERMAN, ESQ.
                            Hartmann Doherty Rosa Berman &
 3                          Bulbulia, LLC
                            433 Hackensack Avenue, Suite 1002
 4                          Hackensack, NJ 07601
                            (201) 441-9056
 5                          mberman@hdrbb.com

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

I N D E X

|  | Page |
| --- | --- |
| Proceedings | 4 |
| The Court's Ruling | 36 |

1                    (Commencement of proceedings)

2              THE COURT OFFICER:  You're on the record.

3              THE COURT:  All right.  This is the matter of the

4    matter of Nina Agdal versus Dillon Danis, Civil No. 23-16873.

5              Can I have appearances, please, beginning with

6    plaintiff's counsel.

7              MR. SHUMOFSKY:  Good morning, Your Honor.  Joseph

8    Shumofsky, Sills Cummis & Gross, representing Nina Agdal.

9              MR. MAYS:  Jason Mays, Marcus Neiman Rashbaum &

10   Pineiro, also for --

11             THE COURT:  For the defense?

12             MR. BERMAN:  Good morning, Your Honor.  Mark A.

13   Berman with Hartmann Doherty on behalf of Dillon Danis, who

14   is sitting to my right.

15             THE COURT:  All right.  Thank you.

16             So I issued this order to show cause on May 31,

17   because, quite frankly, this case has been stymied -- there's

18   really no other way to put it -- by Mr. Danis's failure or --

19   I guess, depending what I hear today, I might have to

20   conclude outright refusal to produce discovery that is -- I

21   don't think there's really been much of a dispute as to its

22   relevance.  I understand he's produced certain discovery and

23   acknowledges as much in the May 31st order.

24             But it became clear during a status conference on

25   May 31 and letters filed by plaintiff on May 30 and May 31

1    that there still remains a significant amount of discovery.

2            And the issue, of course, ends up being that the

3    case is -- which is already coming up on a year old, is

4    brought to a standstill.  If I remember correctly, the issues

5    included -- or the production included Twitter releasing

6    materials, and I think Mr. Berman was going to try to run

7    those down with Twitter and have those produced directly.

8    There is no issue as to privilege.  And then Mr. Berman was

9    speaking with Mr. Danis's manager for the WhatsApp materials

10   and was also -- and I appreciate all of Mr. Berman's efforts

11   on this -- following up on text messages.

12           So let me turn to plaintiff first.  What is still

13   missing?  And then I'll hear from Mr. Berman.

14           MR. SHUMOFSKY:  Your Honor, is it okay if I go to

15   the podium or stand --

16           THE COURT:  Whatever you're more comfortable with.

17           MR. SHUMOFSKY:  Thank you very much, Your Honor.

18           Your Honor, to answer your question what's

19   outstanding, ostensibly almost everything is still

20   outstanding.  Pointedly, Your Honor, the -- you know, I guess

21   if somebody could sympathize with Mr. Berman and his efforts

22   because it seemed like he's trying to do what's right to get

23   us documents and materials that are warranted.

24           The problem is is that he in the position of --

25   which sometimes is far too common is he has a client who's

1   not helping him get the documents for him.  So, for example,

2   using the X materials, Mr. Berman did ultimately did a

3   workaround to try and get materials from X and produce them

4   to the defendant -- to plaintiffs.  But they are

5   unintelligible, and they are not formatted.  And --

6            THE COURT:  Wait, though.  Is that -- when you say

7   they're not intelligible, is this -- what? -- raw data from

8   X?  Or ...

9            MR. SHUMOFSKY:  Yes, Your Honor.  It's -- so to cut

10  through -- we actually subpoenaed nonparty X.  And like most

11  nonparties, they don't want to -- they don't want to be

12  involved, and so we stop chasing nonparties, but we did.  And

13  we spent the resources to do that, and we spoke with counsel

14  to X several times, and he was saying to us, you know,

15  there's a really easy way -- we just spoke with him the other

16  day.  He says there's a super easy way to get the materials

17  formatted.  You see, I don't know why -- I don't know why

18  Mr. Danis didn't do that.

19            THE COURT:  What's that easy way?

20            MR. SHUMOFSKY:  There's a URL which we sent to

21  Mr. Berman again, and Mr. Berman actually initially said that

22  he tried to do that but he had difficulty from a

23  technological standpoint.  I don't know if that meant

24  something on his computer or that meant code for his client

25  would not assist him.

1          But the information that we received from X is that

2    a customer can just download their data, and there's all

3    sorts of information there.  And it's very user-friendly --

4          To try address the situation, because he didn't

5    assistance from his client, Mr. Berman did a workaround and

6    got us alternative data.  That -- I'm using the paraphrasing

7    what X's counsel said.  It's like this was a workaround to

8    get information.  But it's the raw data.  It doesn't indicate

9    who Mr. Danis was communicating with.  You can't read what

10   the data is.  We've shared it with our vendor, who said it

11   would be impossible to try and search this information.  It

12   was kind of a -- it was a document dump.  So while Mr. Berman

13   did say, "Yes, I got it from X and passed it along," now,

14   it's kind of -- becomes plaintiff's problem to try to sift

15   through this stuff which is unintelligible to begin with.

16         THE COURT:  Okay.  So you're saying that the --

17   this raw data that you were able to procure -- or Mr. Berman

18   was able to procure, doesn't tell you who the message -- and

19   I don't use X.  As a judge, I am not sure that's a great

20   idea.  But who the account holder's communicating with, what

21   about what they're saying, the date of it?  Like, if you post

22   a public posting on X, that would -- also those would be

23   unintelligible?  Are these just sort of private messages on

24   X?  Or is it both?

25         MR. SHUMOFSKY:  With respect to the -- a degree of

 1   what can be seen or not seen --

 2              THE COURT:  Right.

 3              MR. SHUMOFSKY:  -- I would defer to Mr. Mays, my

 4   colleague, to speak to that issue.

 5              THE COURT:  Okay.

 6              MR. SHUMOFSKY:  But, Your Honor, the -- as related

 7   in our correspondence to the Court, it is -- the distinction

 8   being is that if this gets downloaded by a customer from X,

 9   it's all kind of categorized --

10              THE COURT:  This is the easy way, you're talking.

11              MR. SHUMOFSKY:  This is the easy way.

12              THE COURT:  Right.

13              MR. SHUMOFSKY:  Categorized, organized, formatted,

14   you can read it, and there's all sorts of information there.

15   You can see if you have -- for example, these are your posts,

16   these are your images, these are the attachments to your

17   posts.  I mean, I'm paraphrasing, it sounds like a lot.  And

18   you can easily look through it, search it and find

19   information as opposed to what we have in addition to being

20   this -- you know, nothing you can agree, it's not organized

21   in any kind of fashion like that, and our vendor, who we --

22   assessed said it would be a waste of time and --

23              THE COURT:  So let me ask this:  Has your vendor or

24   somebody else tried this URL, even if it's on their own

25   account?  I guess what I am wondering is there has to be a

 1  way to cut through -- at least -- we'll get to the other

 2  issues in a moment, but on X, there has to be a way for you

 3  folks to determine for yourselves, is this as easy as X says

 4  it is -- and I'll hear from Mr. Berman obviously in a moment

 5  as to what the issues that he encountered.  Maybe it's just

 6  something as simple -- it might be unpalatable but as simple

 7  as plaintiff counsel, defense counsel, Mr. Danis work off of

 8  the same computer to download this data, to access and

 9  download the data, which you can do here, for all I care.

10  I'm just trying to think of a way to cut through.  You need a

11  computer.  And, frankly, it sounds like you need both

12  parties.

13          Mr. Danis has to be there to do it.

14          MR. SHUMOFSKY:  That's the key part, Your Honor.

15          THE COURT:  Right.

16          MR. SHUMOFSKY:  Mr. Danis.

17          THE COURT:  And I didn't expect Mr. Berman, who I

18  know has undertaken commendable efforts to try and corral all

19  this and head the discovery sanction possibility off at the

20  pass, but I didn't expect him to be this sort of

21  technological, you know, expert to be able to bring all this.

22          On the other hand, if it's easy as X says it is, it

23  shouldn't require some high degree of expertise.

24          MR. SHUMOFSKY:  Your Honor, seizing upon that,

25  like --

|Hearing
|23-cv-16873, July 11, 2024

 1            THE COURT:  Yes.

 2            MR. SHUMOFSKY:  -- it doesn't -- based on our

 3    efforts, chasing down X's counsel, that's what X is saying.

 4    Hey, how do we tell the court, how do we tell defense counsel

 5    how to do this.  This is the easy way.  This is how -- to do

 6    it.  Why did they do it that way?

 7            I mean, in fairness, to say, like, have you checked

 8    to make sure --

 9            THE COURT:  Yeah, I'm just wondering have you

10    beta-tested it to see if it's as easy as -- because I don't

11    know where you get this X counsel who's in Silicon Valley,

12    who things that are intuitive to him technologically because

13    he's imbued with it might not be as technologically intuitive

14    to a bunch of lawyers in New Jersey.  No offense.

15            MR. SHUMOFSKY:  I don't view that.  And I

16    understand the question.

17            And to that, I can tell you this, Your Honor, is I

18    asked -- the other day when I was speaking to X's counsel, I

19    said, "Okay, you're telling us this is a super easy way.  But

20    let's say somebody like myself is trying to figure out and

21    I'm having difficulty" --

22            THE COURT:  Yeah.

23            MR. SHUMOFSKY:  -- "who do you call?"

24            Because, like, we don't even have -- you can email

25    IT department, but it's like a super -- you go to the URL,

1    and customers download their information.

2            At least what was being conveyed is like this is

3    something that a person could just go on themselves.  They

4    don't have to have an -- IT person.

5            THE COURT:  Right.

6            MR. SHUMOFSKY:  -- and from our -- from plaintiff's

7    standpoint, okay, what we do know is Mr. Berman tried that

8    without the -- our understanding, without the assistance of

9    his client.  But it's different if a customer is doing it

10   himself, trying to --

11           THE COURT:  Right.

12           MR. SHUMOFSKY:  -- whatever questions on that might

13   need to be answered personal, identifiers, whatever the case

14   may be.

15           If that gets beta-tested and we're told, like,

16   okay, that doesn't work, then we're stymied once again.

17           THE COURT:  Have you talked to Mr. Berman about

18   these technical difficulties using this URL?

19           MR. SHUMOFSKY:  Yes, insofar as when this first

20   happened, Mr. Berman relayed like, "Hey, I tried using it.

21   There were technological issues.  And then I was able to get

22   this other way."

23           Mr. Berman will probably --

24           THE COURT:  The other way being the way that --

25       (Simultaneous conversation)

1          THE COURT:  The data is incoherent.

2          MR. SHUMOFSKY:  Yes.

3          Mr. Berman then, you know, passed that on, saying,

4     "Here, here's everything I have.  Have at it."

5          The problem is that it's not readable.  And from

6     plaintiff's position, our position is, like, well, now we're

7     getting into just -- this isn't our problem to do defendant's

8     discovery for him.  They should be able to sift through this

9     stuff, given somebody intelligent.  I think -- you know, and

10    I understand Mr. Berman's doing the best -- he's in the

11    position --

12         THE COURT:  Right.

13         MR. SHUMOFSKY:  But he -- they need to do better

14    than just handing over -- information, saying, hey, you spend

15    resources, try to figure out what's here.

16         THE COURT:  All right.  Why don't we, at this

17    point, before we get on to the other data sources, let's hear

18    from Mr. Berman.

19         What can you tell us, Mr. Berman?

20         MR. BERMAN:  So, Judge, so first of all, I will say

21    this:  The attorneys, plaintiff's attorneys, have been very

22    patient and terrific.  So I don't have any complaints in that

23    regard.

24         But for Mr. Shumofsky to say that almost

25    everything's outstanding is just not --

 1          THE COURT:  Well, let's just focus on X and --

 2      (Simultaneous conversation)

 3          MR. BERMAN:  So --

 4      (Simultaneous conversation)

 5          THE COURT:  -- I'd rather do it iteratively rather

 6  than --

 7          MR. BERMAN:  So what happened was after we had our

 8  last conference call, literally like a day or two later, I

 9  heard back from X's attorneys.  And I got a download link.  I

10  downloaded everything that -- from X.  I reviewed it just to

11  eliminate some things that were clearly, you know, unrelated.

12  And then I forwarded it on to these gentlemen exactly as I

13  had received it.

14          And --

15          THE COURT:  And that was through the URL?

16          MR. BERMAN:  I don't know -- what they got was

17  exactly what I have.  So it's not -- the transmission is not

18  an issue, like from me to them.

19          THE COURT:  No, no, no.  That, I get.

20          But I guess --

21      (Simultaneous conversation)

22          MR. BERMAN:  Exactly --

23      (Simultaneous conversation)

24          THE COURT:  -- it's the hard unintelligible way,

25  then the easy --

|Hearing
|23-cv-16873, July 11, 2024

1    MR. BERMAN:  What you get is image -- for all these

2  you get, like, the image files, which are clear -- you know,

3  they are easy to see.

4    THE COURT:  Right.

5    MR. BERMAN:  And then you get often text files

6  which have messages.

7    And I -- listen, I did notice, I must say, that,

8  you know, there was a lot of -- I mean, the messages are

9  there, but there's a lot of other extraneous information --

10    (Simultaneous conversation)

11    MR. BERMAN:  That's what I got from X.  And I

12  forwarded it on in part because I was -- I just had -- and I

13  had a criminal trial in front of Judge Shipp, which I mention

14  only so that I can tell Your Honor I got a not guilty.

15    THE COURT:  Right.

16    MR. BERMAN:  I'm sure Your Honor will appreciate.

17    And -- but, no, I was out of touch for a while for

18  these guys.

19    But they are correct.  It is very difficult to

20  interpret.  But I just assume that's the way X keeps it.

21    Now, there is -- they followed up with me with a

22  link that the user can download, where I will say this --

23  this goes back in time.  Originally, I did try to use that

24  link, and I just literally could not get it to work with

25  Mr. Danis.  He would give me his password.  I would log in.

1    They'd get a code, and it just could not get it to work.

2              I'm more than happy to try again, to download using

3    the user link.  But that was what I originally tried to do.

4              I will say this.  My client is not general -- you

5    know, GE.  So it's -- I have an individual with a high school

6    diploma.  I'm relatively technologically savvy for a lawyer.

7    Not everybody is.  We can see from his communications that

8    he's not technologically savvy.

9              So, you know, when -- the original -- this all

10   arises, they sent a very broad subpoena to X to get all of

11   his activity.

12             So when they say, well, I didn't filter through it,

13   well, originally, they asked for everything.

14             THE COURT:  Right.

15             MR. BERMAN:  So, I mean, it's going to take -- his

16   main communication is through X using messages and the like.

17   It'll take a lifetime to filter through it.

18             And to be honest, I was not going to do it other

19   than --

20        (Simultaneous conversation)

21             THE COURT:  I don't think -- filtering isn't the

22   issue as much as coherent -- access to a coherent version of

23   the data; right?

24             MR. BERMAN:  Yeah.  I provided the X data -- the

25   data we were seeing from Twitter.  If it wasn't -- if it's

1  not comprehensible, I'm happy to go back and try the other

2  way as well.

3          So I don't view that as being an issue in terms of

4  what they're complaining about.  We provided it.  It's not

5  good enough.  We'll go back and try the other way.  Hopefully

6  it'll work.

7          THE COURT:  Look, I'll say this on that because

8  I -- technologically I don't know that I'm in a great

9  position to help.  But I do know from other cases, parties

10  have been able to pull down and produce -- back then it was

11  still Twitter -- but X data.

12          One thing I would strongly recommend, perhaps, is

13  since we're all here, when I'm done with you guys or we can

14  take a break and I'll come back after we see what you found.

15  We've got WiFi.  I see at least one computer.  Why not try it

16  so that counsel can see the same thing at the same time?

17          MR. BERMAN:  I did not bring my laptop, but I see

18  Jason has --

19          THE COURT:  Mr. Mays?

20          MR. MAYS:  We're happy to try that approach.

21          THE COURT:  All right.  I recognize that's just the

22  X data, but I don't know any way to sort of look through this

23  other than item by item.

24          What do you think of that, Mr. Shumofsky?

25          MR. SHUMOFSKY:  Your Honor, I think that's a fine

 1    suggestion to work together.

 2            The one thing I would add, though, is, you know --

 3    as indicated in our papers --

 4            THE COURT:  Wait.  What papers?

 5            MR. SHUMOFSKY:  We submitted a status letter --

 6            THE COURT:  Oh, that 10-page single-paced thing

 7    from -- that I got last night?

 8            MR. SHUMOFSKY:  A lot of was pictures, Your Honor.

 9            THE COURT:  I'm sorry.  Didn't have an

10    opportunity -- but go ahead, you can summarize.

11            MR. SHUMOFSKY:  So it's -- you know, I'm looking at

12    page 2, it says plaintiff discovery vendor advised that

13    because of its format, it's impossible to cull and organize

14    the information in any useful way, for example, by date.

15            Now, it's --

16            THE COURT:  Is she talking about the,

17    quote/unquote, hard way or the URL way?  Or any way?

18            MR. SHUMOFSKY:  This is -- you know, I'm -- this is

19    with respect to the X materials that we received.

20            THE COURT:  Right.

21            MR. SHUMOFSKY:  I'm just pointing out that our

22    vendor said that, you know, the way we received this

23    information, it's impossible to -- organize it.

24            The one thing I just wanted to add, Your Honor, is

25    that it might be the case that no matter what you do, X's

1    material comes out that way.  And then we have to put our

2    heads together and maybe come up with a different way to try

3    to get at, you know, responsive material.

4              THE COURT:  Right.

5              MR. SHUMOFSKY:  But it should not be for

6    plaintiff's counsel in this case to have to chase after X.

7    Like, is it coming out this way?  Can we get it more

8    organized?  What's going on?  It seems like that's the

9    obligation of Mr. Danis, to get on the phone with X, sift

10   through it, figure out how he can give us the stuff.

11             THE COURT:  Hold on, Mr. Berman.  I'm going to give

12   you a chance to reply.

13             MR. SHUMOFSKY:  It's -- you say X is the way that

14   the -- the main way that his client corresponds.  Either he

15   can give us those off his client's phone, and then we can see

16   them --

17             THE COURT:  Wait --

18        (Simultaneous conversation)

19             MR. SHUMOFSKY:  -- see the back-and-forth --

20        (Simultaneous conversation)

21             THE COURT:  What are you proposing to do?

22             MR. SHUMOFSKY:  I'm just saying if this doesn't

23   work, Your Honor, while this is what this is, sorry, there --

24   between plaintiff's counsel and defense counsel, the party

25   responding, can say, all right.  I need to try to figure out,

1   is there an intelligent way you can give this information

2   over to the other party.  And it shouldn't be for us to,

3   like, I guess we're left with just unintelligible stuff.

4           THE COURT:  No.  I don't think anybody's

5   proposing -- well, let me hear from Mr. Berman in response.

6           MR. BERMAN:  So, Your Honor, now I'll start to get

7   into it.

8           So, originally, they sent a subpoena to X.  Right?

9   I objected because it was overbroad.  And I said, let me try

10  to get it myself.  But if I never objected, presumably, they

11  would have gotten from X exactly what I ended up producing to

12  them.  So don't blame me that X's production is not

13  comprehensible.

14          THE COURT:  I got it.  I get it.

15          But I'm going to guess -- I'm going to guess that

16  they also ask for the same materials from the defense.

17          No?

18          MR. SHUMOFSKY:  Yes, Your Honor.

19          THE COURT:  So -- and it is after all -- look, it

20  is, after all, a properly served document production request.

21  It is the defendant's account, and the defendant can

22  reasonably be expected to produce the account.

23          I recognize Mr. Danis, probably like me -- although

24  I don't have an X account for a lot of reasons, but, then,

25  again, you know, I am not a public figure in that sense --

1   may not be the most technologically savvy.

2            Shifting blame here isn't going to -- or point --

3   casting aspersions by either side isn't going to move the

4   needle one bit.  Plaintiff needs the data.  Plaintiff's

5   entitled to the data.  Nobody's arguing the relevance of the

6   data.

7            The question is simply how do we work together to

8   get the data produced so we can move forward with the case?

9   Right?

10           So what I would suggest is this; then we've got to

11  move on the next item.  What I would suggest is when we're

12  done with -- or when I take a break, you guys can jointly try

13  the URL, and hopefully it works.  If it doesn't work, then

14  we'll simply have to figure out some other means of producing

15  the data or getting the data from the defense to the

16  plaintiff.

17           I am not technologically savvy enough -- and as I

18  understand it, you have an IT expert; perhaps they'll have

19  some idea.  It sounds like, frankly -- I am not criticizing

20  your IT expert.  But it sounds like we're all at the mercy of

21  what X says in terms of access.

22           Is that true?  I mean, nobody's coming -- anybody

23  to come up with a workaround to, you know, this data --

24  unintelligible data dump that you got from -- or mildly

25  intelligible data dump that you got from X or this URL.

|Hearing
|23-cv-16873, July 11, 2024

```
 1              Is there a third way if the URL doesn't pan out?

 2              MR. SHUMOFSKY:  Well, yeah -- yes, Your Honor.  It

 3    would seem as though the defendant has possession of those

 4    himself.  He has his -- he has stuff either on his phone or

 5    on his computer, which could be imaged and those things could

 6    be searched for those things on --

 7              THE COURT:  But who does that and how -- because it

 8    sounds like the idea of Mr. Danis himself doing, that is

 9    going to be a losing proposition.  Right?  You'll never be

10    satisfied that you got everything.  I don't know that I can

11    rely on Mr. Danis to do that, from everything that I've

12    heard.

13              So, I don't know.

14              Mr. Berman?

15              MR. BERMAN:  I say let's try this URL with

16    Mr. Danis here and see if that works.

17              THE COURT:  -- take steps.

18              All right.  So, Mr. Shumofsky, what's the next

19    issue?

20              MR. SHUMOFSKY:  Your Honor, the next issue is stuff

21    outside X.

22              THE COURT:  Right.

23              MR. SHUMOFSKY:  So there's more -- you know, in

24    broad strokes, we asked for all communications he had with

25    respect to his discussions about the images that he posted of
```

|Hearing
|23-cv-16873, July 11, 2024

 1    the explicit image nonconsensual of my client.

 2              THE COURT:  Right.

 3              MR. SHUMOFSKY:  We -- so X, we're being told, is

 4    the primary way that he communicated.  But there's other

 5    ways.  There's emails.  There's what happens.

 6              THE COURT:  Wait, wait, wait.  I've got to stop.

 7              How old is Mr. Danis?

 8              MR. BERMAN:  30.

 9              THE COURT:  30.  I don't -- I stopped relying on 30

10    years old to use email a whole lot, just based on litigation

11    experience and daughter experience.  Texting, yeah, I can see

12    that.

13              I'm not saying it's not happening.  I just -- but,

14    I'm sorry.  Go ahead.  Continue.

15              MR. SHUMOFSKY:  Fair, Your Honor.

16              Going into it, we can just put -- plaintiff's --

17    just asked what could be out there?  Emails?  Text messages?

18    WhatsApp?  And then the obligation of Mr. Danis to say, all

19    right, this is what I have or what I don't have.

20              What we received back, ostensibly, except for some

21    de minimis production with respect to a Facebook and

22    Instagram was, like, there's nothing else.  You have what you

23    have.

24              We have received a production from nonparties which

25    demonstrated that Mr. Danis's position is false.  Mr. Danis,

1  for example, said, starting backwards, he said in response to

2  the interrogatories, he said no one else helped him with

3  respect to these posts.  And then we were told, you know,

4  there's really nothing else.  Get the X stuff from X, and

5  you'll be done.

6          And we just recently this week received materials

7  from nonparties, two different nonparties.  One provided us

8  text messages which indicate that Mr. Danis was communicating

9  with him about how to Photoshop certain images, putting my

10  client's face on images with him to then post during the

11  relevant time period.  Those are part of -- that was part of

12  the letter that we submitted to the Court.

13          A separate nonparty, the promoter for the match

14  which Mr. Danis said was the impetus for why he ever posted

15  any of these images or went after my client in the first

16  place, the promoter's saying, hey, you need to -- on

17  WhatsApp, you need to leave Ms. Agdal out of this --

18          THE COURT:  Wait.  I'm sorry.  Who said to leave

19  Ms. Agdal out of it?

20          MR. SHUMOFSKY:  The promoter.

21          THE COURT:  Said that to --

22      (Simultaneous conversation)

23          MR. SHUMOFSKY:  -- to Mr. Danis.

24          THE COURT:  Okay.

25          MR. SHUMOFSKY:  And those -- those -- that

1    correspondence, we received, and it's imaged and part of the

2    submission.

3            The point being is those are two examples that

4    aren't X, that aren't emails -- one's text and one's

5    WhatsApp -- where there's obviously relevant communications

6    that should have been produced.  We had to chase down and get

7    some -- those examples from nonparties.  We don't know what

8    else exists.

9            And it shouldn't be for us to try and, you know,

10   dig around and make Mr. Danis say, "This is what's

11   responsive" instead of saying, "No one else helped me.  I

12   have nothing else to give you."

13           So we have a real, you know -- what Your Honor

14   said, we don't trust Mr. Danis to do it.  So what we had

15   suggested in our papers was to get Mr. Danis to pay for his

16   phone and his computer or electronic equipment that he used

17   to be imaged for them to be searched in a protocol agreed to

18   with defense counsel.

19           THE COURT:  Mr. Berman, do you want to respond?

20           MR. BERMAN:  Yeah.  So what I would say about that

21   is I think Your Honor is correct in your assessment of

22   30-year-olds using email.

23           And I think the approach which makes sense --

24   because we've produced some WhatsApp messages, we've produced

25   Instagram -- and why don't they just take his deposition and

|Hearing
|23-cv-16873, July 11, 2024

 1  ask him these questions under oath, and we'll leave the

 2  deposition open, and they can follow up.

 3          THE COURT:  Well, why should I put them in the

 4  position of drilling down on these questions when they don't

 5  have all of the documents?  I mean, why shouldn't this case

 6  be like any other case -- most other cases?  The parties

 7  produce the overwhelming majority of documents to inform the

 8  questions at deposition.  Why should I switch it here because

 9  Mr. Danis can't pull down -- it sounds like text messages

10  that he had undisputably had with third parties?

11          MR. BERMAN:  Because -- because here's the thing.

12  These folks -- and I get why they're doing it -- are using

13  this litigation as a way of investigating, you know, a much

14  broader event than what's alleged in the complaint, which is

15  they want to figure out -- I mean, originally thought that

16  Mr. Danis had hacked Ms. Agdal's account, and they're trying

17  to dig down to figure out how this picture made it onto the

18  internet to begin with.  They have a theory that someone sent

19  it to Mr. Danis.  That's not accurate.  And all these

20  materials that were just referenced are not -- are not really

21  relevant to the issue as to whether this image violates the

22  statute.

23          So --

24          THE COURT:  Yeah, although, I can certainly see,

25  though, these other communications, they're plainly relevant

|Hearing
|23-cv-16873, July 11, 2024

1  under Rule 26; right?  They very well could be admissible

2  under Rule 404(b).  No?

3           MR. BERMAN:  I don't -- I don't think -- you know.

4  I am not going to sit and argue that it's not within the

5  broad scope of discovery.

6           THE COURT:  Right.

7           MR. BERMAN:  That I am not --

8           THE COURT:  And I only throw out the 404(b) issue

9  to try and illustrate how easily it fits within Rule 26.

10          MR. BERMAN:  All I meant to say is that, given the

11  discovery that's been produced to date, I guess, with the

12  caveat of I would understand why they'd want to wait until

13  the X data is delivered in a format that's more

14  comprehensible, because that's -- if there's anything that's

15  significant, that's where it's going to be.  But -- that I

16  understand.

17          But otherwise -- listen, the text message that

18  Mr. Shumofsky referred to is not changing the course of this

19  litigation.

20          And as I said, I'm happy to leave the deposition

21  open.  I'm happy to ask him who did you text?  Who did you

22  WhatsApp?  And then that will -- I think for them will

23  satisfy the universe of -- of potential leads that they want

24  to pursue to kind of hammer down everything that happened.

25          And they'll have Mr. Danis's version of events

1   under oath, and then I'm happy to address any follow-up

2   discovery demands.

3           But I -- for example, we've produced the WhatsApp

4   communications -- I think we have and Mr. Mien [phonetic] has

5   between him and Mr. -- Mr. Mien, is Mr. Danis's manager.

6           THE COURT:  Right.

7           MR. BERMAN:  He also happens to be a lawyer.  And

8   you can see there's back-and-forth with Mr. Mien telling

9   Mr. Danis, you know, talk to me about these images.

10          It's a very limited time frame, and that's true

11  of --

12      (Simultaneous conversation)

13          MR. BERMAN:  -- and, actually, if I remember

14  correctly, was in that -- it's consistent with what Mr. Danis

15  is saying, that he downloaded these from the internet; they

16  were available on the internet.

17          So --

18          THE COURT:  But the fact that it's a confined or

19  discrete time frame tells me, then, either with his

20  concededly limited technological skills, Mr. Danis should be

21  able to find text messages, for example.  That's not asking

22  too much.  That's just good-faith efforts to search and

23  produce the relevant material.

24          MR. BERMAN:  Well, it's not -- it's actually not

25  so -- I mean, first of all, there's a tremendous amount of

|Hearing
|23-cv-16873, July 11, 2024

1    activity because that's his primary means of communication.

2              THE COURT:  Texts.

3              MR. BERMAN:  And it's -- X messaging.

4              THE COURT:  Okay.

5              MR. BERMAN:  And then it's not just so easy to just

6    do a search on your phone for, you know, all references to

7    Nina or Agdal.  It's not --

8              THE COURT:  No, I am not saying it's not

9    time-consuming.  But it's still an obligation.

10             Mr. Shumofsky, what do you want to tell me?

11             MR. SHUMOFSKY:  Your Honor, I just -- so this is

12   the frustration the plaintiff in this case.  She's spending a

13   lot of resources to chase information down.  Okay?  To just

14   recap, these discovery requests were served in November.  We

15   then submitted supplemental -- a second round of discovery

16   requests in March.  We didn't get any materials.

17             So in April, we wrote to the Court.  And in April,

18   Your Honor issued a text order saying that defendant should

19   get stuff together by May 10 or -- or may -- may consider

20   there may be sanctions.

21             May 10th came and went.  We got some things on

22   May 12th.  That was the Instagram and Facebooks and *de*

23   *minimis* stuff.  But he missed the date, and we didn't get

24   anything else, and we have to come back to the Court.  We

25   wrote a letter in May, May 30th, May 31st, and Your Honor

|Hearing
|23-cv-16873, July 11, 2024

 1  said, "All right.  He missed it again.  What I'm going to do

 2  is I'm going to give him another chance to just get

 3  information and to play ball and help out his attorney to

 4  respond to the requests in this case.  And I'll give you

 5  until July 11.  Otherwise, I may -- you're going to have to

 6  show cause why there shouldn't be sanctions."

 7            THE COURT:  Right.

 8            MR. SHUMOFSKY:  And now we're here today, and in

 9  that time, we have been told, like, okay, there were no

10  other, you know, communications that you need to get.  It's

11  really all in X.

12            And now we have evidence to indicate that is not

13  true.

14            THE COURT:  So let me just clarify.  For example,

15  some of these communications about, for example,

16  Photoshopping Ms. Agdal's image, are those via X?  Are those

17  via --

18      (Simultaneous conversation)

19            THE COURT:  Other than what's been produced, what

20  other forms have you found them?

21            MR. SHUMOFSKY:  This was a text message,

22  Your Honor.

23            THE COURT:  Okay.

24            MR. SHUMOFSKY:  And so -- there's at least a couple

25  of text messages that we included as an example only to show

1  Mr. Danis is corresponding with someone, who said, "Hey, can

2  you Photoshop Nina Agdal's head onto this."

3          And considering Mr. Danis's position, among other

4  things, like, well, this is all part of the motion to --

5  what's going on in this limited time frame seems very

6  relevant considering we're talking posting things online

7  about my client.

8          THE COURT:  Let me ask you this.  Let me ask you

9  this.  Have you ever told the defense -- have the parties

10  ever have a discussion, whether it's part of an ESI

11  protocol -- I understand this case isn't necessarily the sort

12  that ostensibly would lend itself to requiring an ESI

13  protocol, but have the parties ever had a discussion about

14  document custodians?  Like, it has to be -- it has to be that

15  there is a discrete set of individuals with whom -- apart

16  from any public posts, but to the extent there are private X

17  messages, text messages, it has to be that there's a finite

18  universe of people that Mr. Danis would expect to have

19  been -- to be expected to be communicating with.  Right?

20          MR. SHUMOFSKY:  Your Honor, in response to

21  interrogatories, he said I haven't -- you know, with respect

22  to my posts, I wasn't, you know, getting help or

23  communicating with anybody about it.

24          THE COURT:  Okay.

25          MR. SHUMOFSKY:  And so in addition to that, the

|Hearing
|23-cv-16873, July 11, 2024

 1   example I gave you about Photoshopping, we also got

 2   information from WhatsApp.  And I'll read them to you,

 3   Your Honor.  This is -- this is the promoter:  She's

 4   innocent, man.  She doesn't need to be part of this.  Come

 5   on.  Do the right thing.

 6          Response from Mr. Danis:  This is the fight game.

 7   I just don't like to be censured.

 8          That seems very relevant considering the

 9   allegations in the complaint --

10          THE COURT:  Is that before or after posting the --

11   the post that underlies the 15 U.S.C. § 6851 in revenge porn

12   allegations?

13          MR. SHUMOFSKY:  I don't know the exact date.  But

14   it's contemporaneous, Your Honor.

15          But the point being is that there seems to be,

16   based on our investigation going to nonparties, that there

17   are other communications that are relevant that Mr. Danis

18   should have access to, that he certainly shouldn't have

19   deleted considering it was all contemporaneous.  We started

20   this litigation in September, you know, before the fight even

21   happened in October.

22          And now having brought that to the Court,

23   defendant's position is you know what?  Even though defendant

24   has not participated, despite the fact that Your Honor has

25   given two or three chances, despite the fact that he lied in

```
 1   his interrogatory about who helped him, despite the fact that
 2   we're not even just guessing and we're saying, no, he
 3   probably has a lot of more communications, we think -- we
 4   think we are showing you that they exist.
 5            Defense's suggesting, you know what?  Take his
 6   deposition.  Ask some questions, and he'll tell you the
 7   answers.
 8            That is demonstrably unclear and prejudicial to the
 9   plaintiff.  That should not -- what -- what occur.
10            And, Your Honor's right that defendant should
11   participate in discovery.  If he doesn't, he should be fined
12   $1000 a day to get the message.
13            He's in the fight ring, he thought it was a big
14   joke promoting.  This is where we fight, Your Honor, and he
15   needs to understand this is real.  This is not a game, and
16   every time with, well, we'll give you another chance.  And I
17   may do this.
18            He's not going to get it, and we're just going to
19   get more of having to fight and claw to get small pieces to
20   demonstrate that there is more discovery out there that my
21   client's entitled to.
22            MR. BERMAN:  Yeah, so --
23            THE COURT:  Go ahead, Mr. Berman.
24            MR. BERMAN:  Yeah, so the email string he's
25   referring to, first of all, the --
```

|Hearing
|23-cv-16873, July 11, 2024

 1            THE COURT:  Email string?  I thought he said

 2  text --

 3            MR. BERMAN:  It was a text string.  Sorry.

 4            THE COURT:  I just --

 5            MR. BERMAN:  Sorry.  The text that he was referring

 6  to, I mean, the information was provided in responses that

 7  the -- that that message was conveyed by the promoter for him

 8  to stop.

 9            THE COURT:  Wait.  I'm sorry.  Say that again.

10            MR. BERMAN:  The message that the promoter wanted

11  Mr. Danis to stop posting, that was -- that information was

12  provided in response to discovery responses -- in

13  responses --

14            THE COURT:  Wait.  And did the discovery response

15  identify that there was a text sent?

16            MR. BERMAN:  So it did not.

17            THE COURT:  Okay.

18            MR. BERMAN:  But --

19       (Simultaneous conversation)

20            MR. BERMAN:  We're not talking about, like, a

21  month's worth of text messages.  I'm talking about -- you

22  know, a brief back-and-forth.

23            And, again, a text messaging is not Mr. Danis's

24  primary form of communication.

25            And then just to circle back, which is the main

1    issue was the production of the Twitter materials.  And we

2    did produce the Twitter materials.  It's not -- again, it's

3    not my fault that the format they were produce -- I literally

4    provided them in a format I received.  If there's a better

5    way, then, like -- when Your Honor takes a break.

6              THE COURT:  Right.

7              MR. BERMAN:  But there's not some huge vault of

8    other information out there that's going to change the

9    reality of this case.  It's there in the -- I mean, I looked

10   at the images.  You could see the images attached through --

11   to the Twitter messages.

12             THE COURT:  Yeah, already.  We already have a plan

13   for the Twitter, perhaps.

14             MR. BERMAN:  That is -- that's the case right

15   there.  The fact that the promoter wasn't happy with these

16   posts is -- again, it's relevant for purposes of broad

17   discovery, but it's not changing the issue of liability on

18   the underlying offense.

19             And they managed -- they sent all these third-party

20   subpoenas, and they have it.

21             So I think the -- as I like to say, keep behind the

22   ball, the ball is Twitter materials.  Let's see if we can

23   download them, and then -- and then we can reassess the state

24   of the world.

25             THE COURT:  All right.

1          Mr. Shumofsky, you're standing as though you very

2     much want to tell me something.

3          MR. SHUMOFSKY:  It should not be for plaintiff to

4     have to keep point out inconsistencies with what defendant

5     has done.

6          THE COURT:  I got that.

7          MR. SHUMOFSKY:  -- Mr. Berman' position.  I

8     understand he's zealously advocating for his client.

9          The problem here is not Mr. Berman or his efforts.

10         The problem is Mr. Danis.  Okay?  As an example,

11    with respect to the communication with the promoter, we asked

12    for those communications specifically.  What we were told in

13    response was that there are no responsive documents;

14    communications were via telephone.

15         THE COURT:  Wait, wait.  Say that again slowly.

16         MR. SHUMOFSKY:  With respect to the promoter, as an

17    example, that -- you know, I just read the back-and-forth.

18         The response we got back in discovery is that there

19    are no responsive communications, no documents; they were by

20    telephone.  So here's an example that disproves that.  There

21    were actually -- they were not all communications by

22    telephone.

23         THE COURT:  And was that in that context of this

24    specific message that Mr. Berman said was -- disclosed in

25    interrogatory answer?

|Hearing
|23-cv-16873, July 11, 2024

1          MR. SHUMOFSKY:  There was a -- there was an RFP

2    asking for communications with the promoter.

3          THE COURT:  Right.

4          MR. SHUMOFSKY:  What we got back was the

5    communications were by telephone.

6          We are now producing to you the fact -- or we

7    showed you in our letter that there are communications.  It's

8    a -- Your Honor will make the ultimate decision.  But I will

9    tell it's plaintiff's position that defense's idea of

10    discovery, that when this happens and when -- and a party

11    shows that there's other stuff out there, that response would

12    be, like, well, you have it now.  So keep behind the ball;

13    it's okay.  I can continue to be recalcitrant.  I can

14    continue not to participate.  I -- as long as you get it and

15    you have to jump through hoops and you have spend your --

16          THE COURT:  I get it.

17          MR. SHUMOFSKY:  All right.  You understand our

18    frustration.

19          I just wanted to -- relating my client's

20    frustration so you understood that.  I appreciate you

21    listening, Your Honor.

22          THE COURT:  Of course.

23          A couple of things.  One, I can understand

24    Mr. Danis not seeming the most technologically savvy.

25          But the fact is he probably understands X a lot

1    better than this Court or any of the lawyers before the Court

2    because he uses so much.

3            So it's not enough, Mr. Danis, to say, "Well, I

4    don't sort of get how the interstices or the inner workings

5    of X are.  And so, you know, talk to Mr. Berman.  I'm

6    absolved of responsibility."

7            Ultimately, you're the party in the case.  You're

8    the party that's alleged to have taken and then posted these,

9    using X to say, for example, if we hit 2 million on my IG,

10   I'll drop the picture; who had said an X that you have a

11   photo of Ms. Agdal that's, like, a quote/unquote nuclear

12   bomb, that engaged in this back-and-forth in August and

13   September of 2023.  This is part of litigation.  You're a

14   defendant in the case.  You are a litigant.  You have

15   production obligations.

16           And it's not nearly enough -- and I am not going to

17   accept that this case gets stymied because of issue after

18   issue that at bottom is that you're not trying very hard to

19   produce this material.

20           And I have ways of dealing with that.  There are

21   tools that the federal civil procedure, at the Court's

22   disposal to deal with that.

23           And I will say, again, I commend Mr. Berman because

24   I know that he's trying to protect your interests, Mr. Danis,

25   in litigating this matter and has put in a considerable

1    amount of time and effort to try and bring this to bear.

2         But it's clearly not enough.  And we are at a point

3    where, for example, one, even I don't have to be particularly

4    technologically savvy to be able to find messages on via

5    text.  If I think I might have talked to somebody about a

6    particular subject or a particular person, all I need to do

7    is type their name into the bar, the search bar pulls up all

8    the texts I ever had with that person.  I can scroll back

9    until I find what I'm looking for.

10        That's not technologically savvy.  That's just

11   putting in some time and effort and responsibly litigating

12   the case.  Okay?

13        Second, I understand Mr. Berman's argument that at

14   the bottom of the day, under the revenge pornography statute,

15   and 15 U.S.C. § 6851, the core of the case is the posted

16   images in the sense that if we ever had those images -- if

17   those images were never posted, you would have no violation.

18   At the same time, these other conversations surrounding

19   posting or not posting images of Nina Agdal are plainly

20   relevant under Rule 26.

21        And to his credit, I don't understand Mr. Berman to

22   be arguing to the contrary.  They provide a context for the

23   posting.  They provide insight into Mr. Danis's state of

24   mind, whether it was done intentionally.  And very well might

25   or might not be admissible under the federal rules of

1   evidence at trial.  But, certainly, as Rule 26 itself makes

2   abundantly clear, discovery need not be admissible at trial

3   to still constitute or fall within the bounds of Rule 26.

4        Having said all of that, I'm going to do this.  I

5   am not imposing sanctions today.  And I'll -- first, I'll

6   tell you what we're going to do, and then I'll explain why.

7        The defendant must produce all communications

8   regarding any images or communications regarding the

9   possibility or prospect of posting images involving the

10  plaintiff to the defense.  So -- and this is in addition to

11  the parties' and the efforts that counsel's about to engage

12  in when we adjourn here concerning the Facebook or the X

13  URL -- plaintiff is going to send to the defense a letter

14  that clarifies exactly what outstanding discovery there is

15  and also a nonexclusive list of likely document custodians.

16       Now, that doesn't absolve the plain -- defendant,

17  Mr. Danis, of his obligation to thoroughly search for any

18  communications regarding posting images of the plaintiff.

19  But it at least provides some universe of names, again,

20  nonexclusive for Mr. Danis to use in searching through his

21  accounts, text and otherwise, WhatsApp.

22       So plaintiff will send that letter to the defense.

23       Mr. Danis, with the assistance of Mr. Berman, will

24  have one more opportunity to search and produce any and all

25  responsive materials.  They will produce any and all

1    responsive materials, accompanied by a certification that

2    sets forth everything that was done to engage in the search,

3    the results of the search, and for -- and that be production

4    that's been made to the plaintiff at that point, coupled with

5    any prior production, constitutes the sum total of all

6    materials in Mr. Danis's possession or custody and control

7    outside of the Facebook issue and the X issue, which the

8    parties are running down.

9            At that point, plaintiff will depose Mr. Danis.

10    The deposition will be kept open.  And if it comes to the

11    Court's attention that Mr. Danis failed to produce any

12    materials that he could reasonably have been expected by the

13    Court to produce, at that point, we will have a forensic

14    vendor search Mr. Danis's accounts.  And Mr. Danis is going

15    to pay for it.  No ifs, ands, or buts about it.

16            This gives Mr. -- so why am I doing it this way?

17    One, as I said earlier, the entire point of this is to get

18    discovery done so that the case can proceed.  Two, we've been

19    sort of -- and, again, notwithstanding the efforts of

20    counsel, it's been months that we have been trying to get

21    past this production.  I should think at this point,

22    Mr. Danis, as much as anybody, would like to get past this

23    production and move on to a deposition on the merits.  So

24    this gives him an opportunity to do so.

25            If we have to ultimately go down the issue -- the

1    road of sanctions, we will.  But counsel don't need me to

2    tell them that that is becoming an extremely time-consuming,

3    laborious detour that will do nothing to advance this case on

4    the merits.  And I don't know how that would play out at the

5    end of the day.

6              So my focus here is on moving discovery forward in

7    a way that holds Mr. Danis -- it gives him a further

8    opportunity to close the loop on the outstanding production

9    but would hold Mr. Danis accountable if he doesn't discharge

10   that duty thoroughly and responsibly.

11             Okay?

12             I'll say, to try and put dates on it, plaintiff

13   will send that letter to Mr. Berman within a week.  It should

14   be easy enough to do.  I assume it's going to be probably a

15   subset of the letter that was filed yesterday.  So that's the

16   18th, July 18th.

17             Mr. Berman, let me put the ball in your hands for

18   this next -- how long will you and Mr. Danis need to conduct

19   a responsible search?

20             I'll give you a whatever time you need.  I just

21   need you to tell me.  I'm certainly not trying to set you up

22   for anything other than complete success.

23             MR. BERMAN:  Your Honor, can I have four weeks just

24   to --

25             THE COURT:  Yup.  You've got it.

1            So August 19th, then.

2            MR. BERMAN:  Terrific.  Thank you.

3            THE COURT:  Okay.  Obviously, plaintiff is going to

4   need to review that.

5            Side note, where are we with Mr. Wander?

6

7            MR. MAYS:  His -- his continued deposition is next

8   week.

9            THE COURT:  Okay.  Okay.  Great.

10            Thereafter, you'll notice -- I don't know if the

11   parties had met yet to schedule Mr. Danis's deposition.

12   Right?  I assume you folks don't have a date for that because

13   we've been trying to bring this issue to closure?

14            MR. SHUMOFSKY:  Correct.

15            THE COURT:  Okay.  Okay.

16            What I want to do is have a deposition -- I'm

17   sorry -- what I want do is have a status conference not long

18   after Mr. Danis's deposition.  So why don't we say this?

19   Once you have that date -- we'll put a control date on it,

20   just so that -- I don't like to ever not have an upcoming

21   conference date in a case.  Go ahead.

22            MR. SHUMOFSKY:  May I make a suggestion,

23   Your Honor?

24            THE COURT:  Yes.

25            MR. SHUMOFSKY:  -- is potentially subject to the

1    Court's vacation schedule and considering what I'm about to

2    suggest is following -- is not sooner, following the

3    August 19th date, a status conference there to sort of -- if

4    there are any issues that came up, if Mr. Berman experienced

5    any issues with respect to anything, we could deal with them

6    with the Court immediately instead of leading into a longer

7    period for, you know -- after when the deposition date.

8                 THE COURT:  Mr. Berman, I don't know that that's a

9    bad idea.  What do you think?

10                MR. BERMAN:  No.  That's a good idea.  And just as

11   a related/unrelated, just to put on the agenda, I'm going to

12   need to take the plaintiff's deposition at some point.  But I

13   assume --

14                THE COURT:  Sure.

15                MR. BERMAN:  -- after Mr. Danis's.

16                THE COURT:  I'll let counsel work that out.  I am

17   not -- look, you're both excellent -- you are all excellent

18   lawyers.  You'll work on the sequencing.

19                But in any event -- all right.  So we'll put a

20   conference on for not long after August 19th.  Okay?

21                Good.  I'll adjourn for now.  We'll go off the

22   record.  Actually, let's go off the record.  I've got to

23   talk -- I want to talk to counsel and the parties about one

24   thing.

25                        (Conclusion of proceedings)

|Hearing
|23-cv-16873, July 11, 2024
|Certification

1                          Certification

2          I, SARA L. KERN, Transcriptionist, do hereby certify

3  that the 44 pages contained herein constitute a full, true,

4  and accurate transcript from the official electronic

5  recording of the proceedings had in the above-entitled

6  matter; that research was performed on the spelling of proper

7  names and utilizing the information provided, but that in

8  many cases the spellings were educated guesses; that the

9  transcript was prepared by me or under my direction and was

10 done to the best of my skill and ability.

11         I further certify that I am in no way related to any of

12 the parties hereto nor am I in any way interested in the

13 outcome hereof.

14

15

16

17

18 s/ *Sara L. Kern*                         4th of September, 2024

19 _____    _____
   Signature of Approved Transcriber            Date

20

21

22 Sara L. Kern, CET**D-338
   King Transcription Services, LLC
23 3 South Corporate Drive, Suite 203
   Riverdale, NJ  07457
   (973) 237-6080

24

25